*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 11-CF-1443 & 11-CF-1502

LEON ROBINSON

AND

SHANIKA ROBINSON,

APPELLANTS,

V.

UNITED STATES,

APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF1-20856-09, CF1-18732-09)

(Hon. William M. Jackson, Trial Judge)

(Argued November 26, 2013[*]                    Decided September 25, 2014)

*Phillip C. Zane* for appellant Leon Robinson.

*Justin Murray*, Public Defender Service, with whom *James Klein* and *Alice Wang*, Public Defender Service, were on the brief, for appellant Shanika Robinson.

---

[*] Supplemental post-argument briefing at the court's request was completed by March 10, 2014.

*John P. Gidez*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Michelle D. Jackson*, and *Jocelyn S. Ballantine*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and BLACKBURNE-RIGSBY, *Associate Judges*, and STEADMAN, *Senior Judge*.

GLICKMAN, *Associate Judge*:  Appellants Shanika Robinson and Leon Robinson were convicted of a number of offenses committed in connection with the armed robbery and murder of Shahabuddin Rana on August 18, 2009.[1]  The principal issue before us, raised by Shanika Robinson, concerns the *mens rea* required for an aider and abettor to be subject to the additional punishment that is authorized by D.C. Code § 22-4502 (2012 Repl.) when a violent or dangerous crime was committed while armed.  We hold that in order to be subject to the "while armed" enhancement of § 22-4502, an unarmed aider and abettor must have

---

[1] Appellants were indicted and tried on charges of first-degree premeditated murder while armed, second-degree burglary (with intent to steal) while armed, robbery while armed, two counts of first-degree felony murder while armed (with armed second-degree burglary and armed robbery as the predicate felonies), tampering with physical evidence, and conspiracy to rob, murder, commit burglary, and obstruct justice.  Leon Robinson was convicted on all counts.  Shanika Robinson was acquitted of first-degree premeditated murder and of the felony murder charge based on burglary, but was convicted of the lesser-included offense of second-degree murder while armed and of all the other counts of the indictment, including felony murder while armed based on armed robbery.

known that the principal offender (or, if appropriate, another accomplice) was armed. Where direct evidence of actual knowledge is lacking, the government must present sufficient circumstantial evidence for the trier of fact to infer that the aider and abettor knew the principal was armed. Because the trial court in the present case erroneously instructed the jury that the aider and abettor need only have reason to know that the principal offender was armed, and not necessarily actual knowledge of that fact, we must reverse Shanika Robinson's convictions for committing four offenses—first-degree felony murder, second-degree murder, second-degree burglary, and robbery—"while armed." On remand, the trial court will have discretion, on the government's request, to enter judgments of conviction against Shanika Robinson on the lesser included offenses of (unarmed) second-degree burglary and (unarmed) robbery, in lieu of retrying her for the commission of those two offenses while armed. However, for reasons we shall explain, a similar option will not be available with respect to Shanika Robinson's convictions for felony murder and second-degree murder while armed.

Ms. Robinson does not challenge her other convictions, which are not affected by the error, and which we therefore affirm. We also affirm Leon

Robinson's convictions, as none of them are affected by the erroneous instruction on aiding and abetting liability and his claims of other error are not meritorious.

## I.  The Trial

## A. The Government's Evidence

According to the evidence presented by the government, Shahabuddin Rana, the decedent, owned and operated a convenience store called Pizza Mart in Northeast Washington, D.C. He was assisted in running the store by his brother Allauddin Rana, who had come to this country from Pakistan in 2006. To enable his brother to remain in the United States after his initial visa expired, Shahabuddin arranged a sham marriage between Allauddin and appellant Shanika Robinson in October 2008.  Shahabuddin agreed to pay Shanika $500 a week for her continuing cooperation in the sham.[2]

---

[2]  Because appellants share the same last names, as do the two Rana brothers, this opinion often will refer to the four individuals by their first names alone.

In the summer of 2009, however, the imposture began to unravel. Shanika Robinson had a miscarriage, and Allauddin, angered that she had been carrying another man's child, asked his brother for help in obtaining a divorce. Shahabuddin told Shanika the sham marriage arrangement was over and stopped paying her. Allauddin testified at trial that Shanika pressed for a resumption of the weekly payments. On July 22, 2009, she and Allauddin attended an interview with the Immigration and Naturalization Service in furtherance of Allauddin's application to become a permanent resident. The interview did not go well and Shahabuddin's payments to Shanika did not resume. Nonetheless, Shanika continued to urge the Ranas to restart the payments. They refused.

How Shanika reacted to Shahabuddin's cessation of payments was a central point of contention at trial. The government's main witness was Isaiah Genus, a man with whom Shanika had maintained an intimate relationship while she was married to Allauddin. Genus testified pursuant to a cooperation agreement that allowed him to plead guilty to conspiracy and second-degree murder for his complicity in Shahabuddin's murder.

Genus testified that Shanika was distressed by Shahabuddin's cessation of payments because she needed the Ranas' money to pay her rent and was afraid she and the family members who lived with her would be evicted. According to Genus, Shanika "came up with the scheme" to "get the money" by robbing Shahabuddin with the help of Genus and her brother, appellant Leon Robinson. The three discussed this plan in Shanika's kitchen. Shanika stated that they "need[ed] to get a gun."

A few weeks after this discussion, on Saturday, August 15, 2009 (three days before the date on which Shahabuddin was murdered), Shanika told Genus, "[w]e need to get the money." Genus said he had not gotten a gun. Nonetheless, Shanika took a car belonging to the father of Shanika's landlord ("Cap"), picked up Leon, and drove him and Genus to the vicinity of the Pizza Mart. As they approached the store, Leon displayed a kitchen knife and asked Genus if he had "ever use[d] one of these before." Nothing happened on this expedition, however. Upon seeing people outside the Pizza Mart, the trio abandoned their plan and departed because they were "concerned about witnesses."

Early on Tuesday morning, Genus testified, they embarked again: Shanika drove him and Leon to the Pizza Mart in Cap's car. Genus testified that he was not armed and that he did not know Leon was carrying a weapon. On the way, Shanika gave the men latex gloves to wear so that they would not leave fingerprints. Shanika went to the door of the store and induced Shahabuddin to open it for her. When he did, Leon and Genus emerged suddenly from behind Shanika and barged in. According to Genus, Shanika entered the Pizza Mart last and closed the door behind her. Immediately upon entering, Leon started stabbing Shahabuddin with a knife he had brought. (Genus said that this was not the same knife as the one Leon had displayed three days earlier.) Genus and Leon pulled Shahabuddin into a storage room in the back of the Pizza Mart to prevent him from escaping. Once the three men reached the back room, Shahabuddin tried to wrest the knife from Leon's hand. Leon lost control of the weapon and it fell to the floor. He then grabbed a hammer that happened to be lying within reach and struck Shahabuddin in the head with it, repeatedly. Meanwhile, Genus, who had joined in the attack by punching and kicking Shahabuddin, picked up the knife and began stabbing him with it.

Genus's description of this murder was corroborated by the subsequent autopsy; the medical examiner found that Shahabuddin had been stabbed twelve times and had suffered multiple blunt force injuries. The cause of death was determined to be stab wounds to Shahabuddin's torso and blunt force trauma to his head. The medical examiner also reported that Shahabuddin's body was severely burned. Genus explained at trial that Shanika entered the storage room after the attack was over and helped him and Leon set fire to the body.

Before they fled the Pizza Mart (taking, Genus said, "all of the evidence with them"), Shanika took cigarettes, cigars, bleach, peroxide, and cash from the store. These same items were found to be missing when the murder was discovered, according to Allauddin.

Returning to Shanika's house, appellants and Genus burned their bloody clothing on a backyard grill and cleaned the hammer and knife used in the attack with the peroxide and bleach stolen from the Pizza Mart. They then disposed of the weapons by throwing them in a dumpster. Shanika told Genus she had cleaned the car with bleach to remove any blood stains; however, after the police seized the

vehicle a few weeks later, they found what proved to be traces of Shahabuddin's blood inside.

Although Genus was the only prosecution witness who could provide a first-hand account of Shahabuddin's murder, his narrative was corroborated by Charlene Taylor, appellants' cousin, who was living with Shanika at the time. Ten days after the murder, Taylor met with a detective and, in a taped interview, implicated the three in the murder.[3]

Based on the information provided to the police by Taylor, Shanika was arrested and her home was searched on August 28, 2009. During the search, the

---

[3] Taylor testified that Shanika was very upset when the Ranas stopped paying her. Claiming to have overheard the conspirators' planning, Taylor said that Shanika had the idea "to go to the Pizza Mart and get [Allauddin's] brother to let her in. She was going to leave the back door opened so that Leon and Ike [Genus] could come in. They was gone beat him up and take the money." Taylor testified a first attempt at the robbery was aborted because there were too many people at the Pizza Mart. Before the second attempt, Shanika told Taylor she was going to the Pizza Mart and took Cap's car. After Shanika returned, she said "she got [Allauddin's] brother to let her in. She left the back door opened, Leon and Ike came in and everything got crazy." Shanika also said that "[s]he had to get her licks in too," and that they took cigarettes, cigars, and money from the Pizza Mart. The conspirators burned their clothes on the grill, and Shanika cleaned the car with bleach.

police recovered a notebook in which Shanika had written, "Take Cap car of the early morning[,] go to the Pizza Mart bout four in the morning[,] face stand a few feet away from the door. We can do it one or two ways." Leon and Genus were arrested soon afterward.

## B. Defense Evidence

Both Shanika and Leon took the stand and testified at trial. Shanika acknowledged the fake marriage and her financial agreement with the Ranas, and said Shahabuddin ceased paying her after the immigration interview because the brothers were displeased by how it went.[4] Moreover, Shanika said, the Ranas had her in a bind because Allauddin was holding her identification papers, which she needed in order to apply for employment, and Shahabuddin told her she could not have the papers because she was "sleeping around with other people." Genus "offered help" with the situation, but Shanika said she did not want his help because he was a "hothead." Instead, she testified, she called a lawyer to find out

---

[4] Shahabuddin had cut her off on prior occasions, Shanika testified, and she had been able to persuade him to resume the payments.

what she could do. Shanika claimed that her notebook entry about going to the Pizza Mart referred to the possibility of her exposing the Ranas' fraud to the authorities. She explained that her words, "We can do it one or two ways" meant "[t]hat he was going to pay me or I was going to—I really wasn't going to call the police, but I had to come up with something. I just was trying to scare him so he would start back paying me the money."

Shanika testified that she went to the Pizza Mart the day before the murder to speak with Shahabuddin. After their meeting, she felt "he was going to start back paying [her]." Nonetheless, when she told Genus about it, he suggested she "take a guy with [her] to the Pizza Mart," since Shahabuddin "d[id]n't listen to [her] because [she's] a woman." Shanika thought this "wasn't a bad idea."

On the night of the murder, according to Shanika, Genus suggested they go to the Pizza Mart to "get the money" and that she should take two men along. Shanika did not want Genus to come with her "[b]ecause he was drunk, and he has a temper," but she could not dissuade him. So, according to Shanika, she drove Genus and Leon to the Pizza Mart. Shanika believed they were "just going there to

talk to" Shahabuddin. She testified that she did not have any weapons and that "to her knowledge" neither did Leon or Genus.[5]

Shanika denied participating in Shahabuddin's murder or in the robbery of his store. She testified that when she, Leon, and Genus arrived at the Pizza Mart, all three approached the service window and she asked Shahabuddin for her identification papers and money. Shahabuddin asked her if she "brought security," and at that point Genus and Leon intervened and started "cuss[ing] him out." A loud and angry argument among the men ensued, in the course of which Shahabuddin came to the door and opened it. As the "yelling and screaming" continued, Shanika "became frustrated, because [she] was just trying to get [her] stuff," so she "got mad and . . . walked off." Shanika testified that she went back to the car, smoked a few cigarettes, and waited there until Leon and Genus eventually returned. The next day, Genus gave her $500, and although she "kind of knew where the money came from . . . [she] was too afraid to ask him." Shanika testified she first learned that Shahabuddin was dead when one of her sisters called and told her so. Although she thought about "turning [her]self in,"

---

[5] Shanika also denied providing Genus and Leon with gloves.

she did not do it because, she explained, she "didn't kill him. But [she] knew that all of it . . . revolved around [her] trying to get [her] stuff back."

In his testimony, Leon denied having been at the Pizza Mart when Shahabuddin was murdered or during the abandoned robbery attempt three days earlier. He likewise denied having participated in disposing of evidence. Leon claimed he did not know Shanika's marriage to Allauddin was a sham, was never told the Ranas owed Shanika money, and was never asked to help Shanika rob Shahabuddin.

## C. The Jury's Inquiries Regarding Aiding and Abetting

In its final charge to the jury, the trial court instructed, *inter alia*, on the *mens rea* required for aiding and abetting liability. In general terms it told the jury that to find a defendant guilty of a crime as an aider and abettor, it would have to find that the defendant "knowingly associated him or herself in the commission of the crime, that he participated in the crime as something that he or she wished to

bring about and that he or she intended by his actions to make it succeed."[6] More specifically, with respect to each substantive offense alleged in the indictment, the court told the jury that the intent the government had to prove was the same whether the defendant was the principal offender or an aider and abettor. There was no objection to these instructions, and no issue is raised about them on appeal. However, the instructions did not specifically address the *mens rea* necessary for an aider and abettor to be found guilty of an offense allegedly committed *while armed*. There was no request for such an instruction, and no objection to its omission.

The day after the jury began its deliberations, it sent a note asking the following questions:

> With regard to 2nd Degree Burglary While Armed, does the defendant—if an aider and abettor—have to have personally entered the Pizza Mart to be found guilty of this charge?

---

[6] *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 3.200 (Rev. 2013) (the "Redbook"); *see also Wilson-Bey v. United States*, 903 A.2d 818, 825 (D.C. 2006) (en banc).

> Also, does aiding and abetting apply to element 3 [the while armed element] of 2nd Degree Burglary While Armed?
>
> If yes, [i]s knowledge of a weapon a requirement for guilt?[7]

The parties agreed on the answer to the first question—a defendant did not need to enter the Pizza Mart to be found guilty of burglary as an aider and abettor—and the trial court so instructed the jury. However, the parties disagreed as to how to answer the second and third questions. Appellants argued that under this court's decision in *Wilson-Bey v. United States*,[8] the court needed to tell the jury that an aider and abettor had to know of the weapon at the time of entry to be guilty of second-degree burglary while armed. The government maintained otherwise and cited this court's decision in *Fox v. United States* for the proposition that "an individual is guilty of aiding and abetting an armed robbery if he aids and abets a robbery and he knows or has reason to know that the principal will be

---

[7] The court had instructed the jury that the third element of second-degree burglary while armed was "that at the time of the entry the defendant was armed with a deadly or dangerous weapon, that is, a knife or shod foot or shod feet." (The court did not mention the hammer in connection with the burglary charge because there was no evidence that any defendant brought it into the Pizza Mart.)

[8] 903 A.2d 818 (D.C. 2006) (en banc).

armed."[9] After requesting and receiving briefing on the issue, the court was persuaded to respond to the jury's questions by instructing it that "[t]he aider and abettor must know or have reason to know that the principal offender was armed."[10]

Within an hour after the jury was so instructed, it sent the court another note, asking:

> At what point of time during the commission of the crime of second degree burglary while armed does one need to know or have reason to know that a principal is armed to be an aider and abettor?
>
> Is knowing or having a reason to know after point of entry sufficient?[11]

---

[9]  11 A.3d 1282, 1289 (D.C. 2011).

[10]  In its note, the jury also had inquired whether an aider and abettor's mere "awareness of shoes being worn" by the principal would by itself "constitute being 'armed with a deadly or dangerous weapon?'"  After conferring with counsel, the trial court instructed the jury, without elaboration, that the answer to this question was "no."

[11]  The note also asked, "Can you better define time of entry?" The court responded, "I really can't. But again, we're focusing on the principal's entry, the time the principal entered the premises, in this case the Pizza Mart."

In response, the judge instructed the jury as follows:

> For a principal to be guilty of second-degree burglary while armed, he or she must be armed at the time of the entry . . . . So the aider and abettor must know or have reason to know that at the time of the entry into the Pizza Mart by the principal that the principal is, in fact, armed or would be armed.

Twenty minutes after receiving this answer, the jury returned its verdict. It found Leon Robinson guilty on all counts. It found Shanika Robinson not guilty of first-degree premeditated murder while armed and not guilty of felony murder with armed burglary as the predicate felony, but guilty of all the other charges, including the lesser-included offense of second-degree murder while armed.[12] The jury further found, as a statutory aggravating circumstance charged in the indictment, that the murder was especially heinous, atrocious, or cruel.[13]

---

[12] Second-degree murder while armed was the only lesser-included offense submitted to the jury.

[13] *See* D.C. Code § 22-2104.01 (b) (4), (5) (2012 Repl.); *see also Keels v. United States*, 785 A.2d 672, 685-86 (D.C. 2001) (requiring jury determination of existence of statutory aggravating factors).

## II. Discussion

Shanika Robinson claims the trial court erred by instructing the jury, in response to its inquiry, that an aider and abettor may be found guilty of second-degree burglary while armed if she merely had "reason to know" the principal offender was armed. The government now concedes this instruction was erroneous. For the reasons that follow, we agree, and we conclude that Shanika's convictions for the four armed offenses—armed robbery, armed second-degree burglary, armed second-degree murder, and felony murder while armed (predicated on the armed robbery)—must be vacated, because we cannot say beyond a reasonable doubt that they were unaffected by the error. On remand, however, the government will have the option of accepting the entry of judgments of conviction for unarmed robbery and second-degree burglary in lieu of retrying Shanika Robinson on those armed counts.

Leon Robinson's primary claim on appeal is that the trial court erred by refusing to grant his motion to sever his trial from that of his co-defendant, because he and Shanika presented irreconcilable defenses. We conclude that the court did not abuse its discretion by denying severance, and that Leon's other claims are

meritless. Accordingly, we affirm his convictions (subject to the merger of certain counts, which should be effectuated on remand).

## A. Shanika Robinson's Claim of Error

### 1. Liability of an Aider and Abettor for Commission of a Crime While Armed

D.C. Code § 22-4502 (a) permits the imposition of enhanced punishment on defendants convicted of having committed a crime of violence or a dangerous crime "when armed with or having readily available" a firearm or other dangerous or deadly weapon. The term "armed with" means having "actual physical possession" of the weapon in question,[14] while "having readily available" means, "at a minimum," having constructive possession of the weapon.[15] The "while armed" charges in the present case were based on actual physical possession of the weapons used in the murder by Leon Robinson and Genus; that is why the court did not instruct the jury on the "having readily available" alternative. But whether

---

[14] *(Phillip) Johnson v. United States*, 686 A.2d 200, 205 (D.C. 1996); *see also Cox v. United States*, 999 A.2d 63, 69 (D.C. 2010).

[15] *Guishard v. United States*, 669 A.2d 1306, 1314 (D.C. 1995); *see also Cox*, 999 A.2d at 69.

actual or constructive, possession requires that the possessor *knowingly* be in control of the weapon.[16]

If the principal offender must know he is armed when he is committing a violent or dangerous crime in order to be subject to the "while armed" enhancement of § 22-4502, then the aider and abettor (if unarmed herself, like Shanika Robinson in this case) also must know the principal is armed for the enhancement to be applicable to her as well. This is so for two reasons. First, and most basically, to be guilty of a crime—here an offense committed while armed— as an aider and abettor, a person must, *inter alia*, intend to facilitate the *entire offense*, not some lesser offense.[17] As the Supreme Court recently has put it, "an

---

[16] *Wheeler v. United States*, 977 A.2d 973, 987 n. 36 (D.C. 2009) *as amended by order*, 987 A.2d 431 (D.C. 2010). Our cases have defined "actual possession" as "the ability of a person to *knowingly* exercise direct physical custody or control over the property in question." *(Courtney) Johnson v. United States*, 40 A.3d 1, 14 (D.C. 2012) (emphasis added) (quoting *United States v. Hubbard*, 429 A.2d 1334, 1338 (D.C. 1981)); *see also White v. United States*, 763 A.2d 715, 724-25 (D.C. 2000). Constructive possession likewise entails knowledge of the location of the item, as well as the ability and intention to exercise dominion and control over it. *See, e.g.*, *Rivas v. United States*, 783 A.2d 125, 129 (D.C. 2001) (en banc).

[17] *See Wilson-Bey*, 903 A.2d at 831 (stating that aiding and abetting liability requires that the accomplice "'in some sort associate himself with the venture, that

aiding and abetting conviction requires not just an act facilitating one or another element, but also a state of mind extending to the entire crime. . . . [T]he intent must go to the specific and entire crime charged—so here, to the full scope (predicate crime plus gun use)."[18] A person cannot intend to aid an armed offense if she is unaware a weapon will be involved.[19] Second, as is articulated in our *Wilson-Bey* line of cases, the *mens rea* required for conviction of a crime is normally the same for an aider and abettor as it is for the principal offender.[20] A

---

he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed'") (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).

[18] *Rosemond v. United States*, 134 S. Ct. 1240, 1249-50 (2014) (holding that to convict a person as an aider and abettor under federal law prohibiting using or carrying a firearm during a crime of violence or a drug trafficking crime, the government must prove that the person knew in advance that one of his accomplices would be armed). We have looked to the federal courts' interpretation of the federal aiding and abetting statute, 18 U.S.C. § 2, for guidance in construing our own aiding and abetting statute, D.C. Code § 1805 (2012 Repl.). *Wilson-Bey*, 903 A.2d at 831.

[19] Conversely, "for purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission." *Rosemond*, 134 S. Ct. at 1249.

[20] *See, e.g.*, *Kitt v. United States*, 904 A.2d 348, 356 (D.C. 2006) ("[W]here a specific *mens rea* is an element of a criminal offense, a defendant must have had that *mens rea* himself to be guilty of that offense, whether he is charged as the principal actor or as an aider and abettor"); *see also Collins v. United States*, 73

defendant ordinarily cannot be convicted of an offense as an aider and abettor if he or she possessed a lesser *mens rea* than that required of the principal. In particular, *Wilson-Bey* rejected the proposition (and any jury instruction incorporating it) that a defendant may be held liable as an aider and abettor based on a merely negligent state of mind—i.e., for acts of confederates that were merely "reasonably foreseeable" to the defendant or the "natural and probable consequences" of the criminal venture in which the defendant intentionally participated—when a degree of *mens rea* higher than negligence was required to convict the principal actor for those acts.[21]

---

A.3d 974, 981 n.3 (D.C. 2013) (in order to convict a defendant as an aider and abettor "the government was required to show that the accomplice had the same intent necessary to prove commission of the underlying substantive offense by the principal."); *Lancaster v. United States*, 975 A.2d 168, 174 (D.C. 2009) ("Because armed robbery is a specific-intent crime, the government must prove that the aider and abettor shared the same *mens rea* required of the principals.").

[21] *Wilson-Bey*, 903 A.2d at 836-39; *accord, Coleman v. United States*, 948 A.2d 534, 553 (D.C. 2008) (holding that a conviction for second-degree murder as an aider and abettor "cannot stand on the basis that the defendant was merely negligent"). "A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct." Model Penal Code § 2.02. Of course, if the circumstances support a supposition that a person had reason to know a fact, those circumstances might also support an inference that the person had actual knowledge of that fact.

For these reasons, we conclude that the enhanced penalty provisions of D.C. Code § 22-4502 may not be applied to an aider and abettor who only had "reason to know" the principal offender was "armed with" a dangerous weapon during the commission of a violent or dangerous crime. Actual knowledge of the weapon is required for either the principal offender (which is seldom an issue) or the aider and abettor to be subject to § 22-4502. Any jury instruction on the "while armed" element must be consistent with that requirement.[22]

---

[22] The Redbook's proposed instruction regarding aiding and abetting "while armed" offenses states that "[a]n aider and abettor is legally responsible for the principal's use of a weapon during an offense if the government proves beyond a reasonable doubt that the aider and abettor had actual knowledge that some type of weapon *would be used* to commit the offense." Instruction 3.200 (emphasis added). While this instruction correctly requires that the aider and abettor have actual knowledge of a weapon, it should be modified to require only knowledge that the principal is armed (since use of a weapon to commit the offense is not a prerequisite for guilt under § 22-4502). Additional modification of the instruction may be necessary to properly reflect the requirements of constructive possession when the principal is not alleged to have had actual possession.

This court's decision three years ago in *Fox*,[23] on which the trial court relied, does not stand in the way of that conclusion. *Fox* stated that "*Wilson-Bey* did not overrule the principle, well-established in our case-law, that an individual is guilty of aiding and abetting an armed robbery if he aids and abets a robbery and he knows or has reason to know that the principal will be armed."[24] That statement is literally true; indeed, while post-*Wilson-Bey* cases have expanded the applicability of *Wilson-Bey* beyond specific-intent crimes,[25] the present case is the first one in which we have had to consider *Wilson-Bey*'s application to the "while armed" enhancement provided by D.C. Code § 22-4502.[26] The *Fox* court did not have occasion to consider that question; the quoted language is dictum and not a binding holding, because (1) the evidence at trial in *Fox* demonstrated that the aider and abettor in fact had actual knowledge that the crime would be committed while

---

[23] *Fox v. United States*, 11 A.3d 1282 (D.C. 2011).

[24] *Id.* at 1289 (citing, *inter alia*, *Guishard v. United States*, 669 A.2d 1306, 1314 (D.C. 1995)).

[25] *See Sutton v. United States*, 988 A.2d 478, 490 (D.C. 2010); *Wheeler v. United States*, 977 A.2d 973, 986 n. 34 (D.C. 2009), *as amended by order*, 987 A.2d 431 (D.C. 2010).

[26] Our holding in this case was anticipated, though, in *Wheeler*; *see id.* at 987 n.36.

armed;[27] (2) the jury was not told an aider and abettor could be guilty of armed robbery if he lacked such knowledge or if he only had reason to know the principal would be armed;[28] (3) the instruction given on aiding and abetting was clearly a proper one under *Wilson-Bey* and subsequent case law;[29] and (4) the appellant had not objected to that instruction in the trial court, nor had he requested a different one, so this court's review of the instruction's adequacy therefore was, as the court said, "only for plain error."[30]  To the extent *Fox*'s dictum nonetheless implies that an unarmed aider and abettor may be guilty of an armed offense if she merely has reason to know the principal offender is armed, we disavow it along with the pre-

---

[27] *Fox*, 11 A.3d at 1287.

[28] *See id.* at 1288-89.

[29] The instruction did not contain the "natural and probable consequences" language that *Wilson-Bey* had disapproved, and it properly informed the jury that to convict a defendant as an aider and abettor, it had to find that he "knowingly" associated himself with the commission of a crime, participated in the crime as something that he "wished to bring about," and "intended by his actions to make it succeed. *Id.*  The same instruction recently had been approved as adequate in another post-*Wilson-Bey* decision, *Appleton v. United States*, 983 A.2d 970, 978 (D.C. 2009), and the *Fox* court found it "hard to imagine" how it could have confused the jury with respect to *mens rea*. *Fox*, 11 A.3d at 1289.

[30] *Id.* at 1288.

*Wilson-Bey* precedent on which it relied, as being incompatible with the reasoning of the en banc court in *Wilson-Bey*.[31]

We perforce hold that the trial court in the present case erred by instructing the jury, in response to its inquiries, that a defendant could be convicted of second-degree burglary while armed as an aider and abettor if she had reason to know the principal perpetrator of that crime was armed.

### 2. Whether the Instructional Error Was Prejudicial

The government argues that the instructional error was harmless as to all of Shanika's convictions other than the one for the charge to which the jury's inquiries and the court's responses specifically related, second-degree burglary while armed. This is so, the government contends, because even if Shanika did not know at the time her co-conspirators entered the Pizza Mart that they were armed, the evidence was overwhelming that she herself entered the Pizza Mart and was "present, participating, and aware of the presence of weapons" when the armed

---

[31] *See Wheeler*, 977 A.2d at 986 n. 34 (citing *Thomas v. United States*, 731 A.2d 415, 420 n.6 (D.C. 1999)).

robbery and murder were committed. Shanika Robinson disagrees. She argues that the instructional error compromised the jury's verdict finding her guilty of all the "while armed" offenses—not only second-degree burglary while armed, but also the charges of armed robbery, felony murder while armed with the predicate felony of armed robbery, and second-degree murder while armed. For as the jury was instructed, even if it believed that Shanika did not know Genus or Leon was armed, the "while armed" element of each of the offenses was satisfied if she merely had reason to know it.

We think Shanika Robinson has the better of this argument. There is no question that the government presented sufficient evidence to permit the jury under proper instructions to find her guilty as an aider and abettor of each "while armed" crime charged in the indictment. But the erroneous instruction allowed the jury to convict her of aiding and abetting those offenses without finding she had the necessary *mens rea* to do so. Such an error is of constitutional magnitude, meaning we must vacate the convictions in question unless we are persuaded the

error was harmless beyond a reasonable doubt.[32]   If there exists a reasonable possibility that the jury's verdict on a given count was affected by the instructional error, Shanika is entitled to relief.[33]

Judging by the jury's verdict and the questions it asked the court during its deliberations, we think it is reasonably possible the jury found Shanika guilty of each "while armed" offense as an aider and abettor without finding she knew her confederates were armed.  Shanika, it will be recalled, denied intending to kill Shahabuddin or knowing that her confederates were going to do so, and she denied knowing they were armed.  Moreover, she claimed that she did not enter the Pizza Mart while Genus and Leon were inside it committing the murder and robbery. Instead, she testified, she left them after they went inside and waited for them back

---

[32] *See Wilson-Bey*, 903 A.2d at 843 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

[33] *Morten v. United States*, 856 A.2d 595, 601 (D.C. 2004) (acknowledging that "the harmless 'beyond a reasonable doubt' standard and the test of '[no] reasonable possibility' of an effect on the conviction" are equivalent) (citing *United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985)).

at the car.  Despite Genus's testimony to the contrary, there is reason to believe the jury credited Shanika on these points.

First, the jury acquitted her of the two charges that required it to find she had an intent to kill:  first-degree premeditated murder while armed and felony murder while armed with armed second-degree burglary as the predicate felony.[34]  Given that the jury simultaneously convicted Shanika of both the burglary and the lesser offense of second-degree murder while armed (of which intent to kill is not an essential element[35]), the acquittals imply that the jury credited her testimony that

---

[34]  Because robbery is one of the felonies enumerated in the felony murder statute, D.C. Code § 22-2101 (2012 Repl.), and second-degree burglary is not, the government is required to prove an intent to kill in order to convict a defendant of felony murder with the underlying felony of second-degree burglary, but is not required to prove that intent for robbery. *See Kitt v. United States*, 904 A.2d 348, 355 (D.C. 2006).

[35]  *Coleman v. United States*, 948 A.2d 534, 550 (D.C. 2008) (intent to kill not an essential element of second-degree murder); *Lee v. United States*, 699 A.2d 373, 383 (D.C. 1997) ("To prove burglary, the government must establish 'that the defendant entered the premises having already formed an intent to commit a crime therein.'"). The jury was instructed it could find a defendant guilty of second-degree murder based on a *mens rea* of "conscious disregard of extreme risk of death or serious bodily injury to the decedent," or intent to inflict serious injury, as alternatives to the intent to kill.  It was instructed that it could find a defendant guilty of second-degree burglary if at the time he or she entered the Pizza Mart, the defendant had the "intent to steal the property of another."

she did not mean for Shahabuddin to be killed when she arrived at the Pizza Mart on the morning of August 18.[36]

Second, the jury's final note to the court before it returned its verdict (asking when during the commission of an armed burglary an aider and abettor needs to know or have reason to know that the principal is armed, and whether knowing or having reason to know after the entry is sufficient) indicates that the jury credited Shanika's testimony that she did not know Genus or Leon was armed as of the time the men entered the Pizza Mart.

Third, we have no sound basis to conclude the jury must have found that Shanika knew even by the time of the murder and/or the robbery inside the Pizza Mart that Genus and Leon were armed. We cannot infer from the inquiry in its

---

[36] The jury's conviction of Shanika on the conspiracy count does not contradict this inference. The jury was instructed that "the object of the conspiracy was to commit four offenses: burglary, robbery, murder, and obstruction of justice," but that to find a defendant guilty of the offense of conspiracy, it only had to find that an agreement existed to "commit at least one of th[os]e four crimes." The verdict form does not indicate which of the four crimes the jury relied upon, nor does it specify what overt acts in furtherance of the conspiracy the jury found. Shanika's conspiracy conviction therefore does not show the jury found she conspired to kill Shahabuddin.

note that the jury found Shanika learned the men were armed *after* they entered the Pizza Mart, because the jury was careful to ask whether "knowing *or having a reason to know*" that fact following the entry would suffice. To be sure, if the jury found that Shanika followed Genus and Leon into the store, then we might be confident it also found she knew then that the men were armed. But Shanika denied that she entered the Pizza Mart at any time on the morning of Shahabuddin's murder, and nothing in the jury's verdict shows that it disbelieved her.

In sum, the jury could have found that Shanika drove Genus and Leon to the Pizza Mart only to rob and burglarize it, that she waited for her accomplices in the car after they gained entry, and that she did not enter the Pizza Mart herself at any time during this trip. And the jury could have found that Shanika did not know Genus and Leon were armed until sometime after the robbery and murder were completed, if it all.[37] The jury still might have found Shanika guilty of the "while

---

[37] Because Shanika testified that she never saw a weapon, even after Leon and Genus returned to the car, there is no question as to whether, even if the jury believed her narrative of events, she became aware of the armed nature of the crime while asportation of the stolen goods was ongoing, and whether that awareness would satisfy the "while armed" *mens rea* requirement.

armed" offenses if, misled by the court's erroneous response to the jury note, it thought reason to know the principal offenders were armed was all the prosecution had to show to establish the *mens rea* required for aiding and abetting those offenses.

Because it is reasonably possible the instructional error caused the jury to misunderstand and misapply the law in finding Shanika Robinson guilty on the "while armed" counts, we cannot find the error harmless with respect to any of them.

### 3. Appropriate Relief

It does not necessarily follow that Shanika Robinson is entitled to a new trial on each "while armed" count. While retrial on those counts is certainly an available option, there may be a more tailored alternative: allowing the trial court to enter judgments of conviction, with the consent of the government, for the lesser-included, "unarmed" offenses. This alternative is open to consideration so long as the instructional error did not affect the jury's determination of Shanika's guilt on a given count other than with respect to the "while armed" element of the

offense. Because the parties did not address the availability of this option in their briefs prior to oral argument, we requested and have received supplemental post-argument briefing on the question.

The government argues that it would be appropriate to allow the trial court on remand to enter judgment on four unarmed offenses—first-degree felony murder with the predicate of simple robbery, second-degree murder, robbery, and second-degree burglary. Shanika disagrees, however, and urges us to reject that option in this case because the jury was not asked to consider any lesser-included unarmed offenses and because the government, before it responded to our request for supplemental briefing, did not ask this court for any disposition other than outright affirmance of her convictions. In addition to those objections, Shanika argues it would be improper to enter a judgment of conviction against her for either unarmed murder offense, because the instructional error also tainted the jury's findings supporting that offense, or because the jury did not even find all the elements of the "lesser included" offense.

It is well-established that this court "may direct [or allow] the entry of judgment for a lesser included offense when a conviction for a greater offense is

reversed on grounds that affect only the greater offense."[38] Our authority to do this derives from our broad statutory power to "affirm, modify, vacate, set aside or reverse any order or judgment of a court . . . lawfully brought before it for review, and [to] remand the cause and direct the entry of such appropriate order, judgment, or decision, or require such further proceedings to be had, as is just in the circumstances."[39] We are not precluded from exercising this authority to provide

---

[38] *Gathy v. United States*, 754 A.2d 912, 919 (D.C. 2000) (allowing judgment of conviction for assault with a deadly weapon as a lesser-included offense of aggravated assault while armed where trial court failed to instruct on serious bodily injury but all other elements of assault with a deadly weapon were satisfied by the proof at trial and the jury's verdict); *see, e.g.*, *Willis v. United States*, 692 A.2d 1380, 1383 (D.C.1997) (allowing judgment of assault with a deadly weapon when instructional error only affected greater offense of assault with intent to murder while armed); *Zellers v. United States*, 682 A.2d 1118, 1122 (D.C.1996) (directing that first-degree theft conviction be reduced to second-degree theft when evidence of value, needed to prove first-degree theft, was insufficient); *Boone v. United States*, 296 A.2d 449, 450 (D.C.1972) (reversing grand larceny conviction and directing that conviction of petit larceny be entered); *see also Allison v. United States*, 409 F.2d 445, 452 (D.C. 1969) (directing judgment of conviction of offense of taking indecent liberties with minor child as lesser-included offense of assault with intent to commit carnal knowledge where material facts of greater offense were not sufficiently corroborated); *Austin v. United States*, 382 F.2d 129, 142-43 (D.C. 1967) (directing judgment of conviction of second-degree murder where government's evidence was insufficient to warrant submission of an issue of premeditation and deliberation required for conviction of greater offense of first-degree murder); *Rutledge v. United States*, 517 U.S. 292, 305 and 305 n. 15 (1996) (citing *Allison* and *Austin* with approval).

[39] D.C. Code § 17-306 (2012 Repl.)); *see Austin*, 382 F.2d at 140-41.

for relief that is "just in the circumstances" merely because the litigants did not seek it. The notion of a governmental "waiver" here is out of place, for an appellant is not entitled to more relief from this court than is necessary to cure the error we find; nor can an appellant justifiably claim to be surprised that we would consider the far-from-novel option of directing or permitting entry of judgment on a lesser-included offense unaffected by any error.[40]

Moreover, we have never held that this option is foreclosed if the jury was not instructed on the lesser-included offense.[41] We perceive no reason that should

---

[40] In any event, as we often have stated, "no matter whose ox is gored, this court has frequently requested post-argument briefing of issues not adequately raised by counsel, to the end that, after both parties have been fully heard, the court is in the best position to render a sound decision." *Randolph v. United States*, 882 A.2d 210, 226 (D.C. 2005). We did exactly that here.

[41] Shanika asserts that *Lee v. United States*, 959 A.2d 1141 (D.C. 2008) and *Bostick v. United States*, 605 A.2d 916 (D.C. 1992) preclude the entry of judgment on a lesser-included offense on which the jury was not instructed, but she misreads both decisions. In *Lee* and *Bostick*, we reversed second-degree murder convictions because the trial court erroneously refused to instruct the jury on provocation as a mitigating circumstance. In each case, this court considered whether to afford the government the option to accept entry of a verdict on the lesser-included charge of voluntary manslaughter as an alternative to a retrial even though the trial court had not instructed the jury on the lesser charge. We declined to adopt that course, not because there had been no instruction on voluntary manslaughter, but in the

make a difference, as long as we are assured that the jury, in convicting the defendant on the greater offense, necessarily and actually did find all the elements of the putative lesser offense[42] on a record permitting it to do so, and that entry of judgment on the lesser offense will result in "no undue prejudice" to the accused.[43] In declining to request an instruction on a lesser-included offense, the defendant may have preferred to make an all-or-nothing gamble on the trial's outcome; but where the defendant has lost that gamble and been found guilty of the greater

---

exercise of our discretion because the government did not request it (nor did the appellant) and a simple remand for a new trial rendered it unnecessary to reach other claims of error. *See Lee*, 959 A.2d at 1145 & n.6, and *Bostick*, 605 A.2d at 920 & n.15.

[42] *See Brown v. Ohio*, 432 U.S. 161, 166 (1977) (using the "*Blockburger* test," which asks "whether each provision requires proof of an additional fact which the other does not" to determine whether an act constitutes one crime or two, in order to determine that joyriding is a lesser included offense of auto theft) (quoting *Blockburger v. United States*, 284 U.S. 299, 304, (1932)); *Gathy*, 754 A.2d at 919 ("A crime can only be a lesser-included offense of another if its required proof contains some, but not all, of the elements of the greater offense.") (internal quotation marks omitted).

[43] *Allison*, 409 F.2d at 451 (stating that the authority to modify a criminal judgment by reducing the conviction to that of a lesser-included offense may be exercised where the greater offense cannot stand, provided that the evidence "sufficiently sustains all the elements of another offense, . . . , the latter is a lesser included offense of the former, and . . . no undue prejudice will result to the accused").

offense, he is not aggrieved if his conviction is reduced to a true lesser-included crime that is supported by the evidence and untainted by error.

Accordingly, with respect to each of Shanika Robinson's four convictions for a "while armed" offense, we may proceed to consider whether the government should have the option on remand of accepting the entry of judgment for a lesser-included unarmed offense. Because the *Chapman* standard of harmlessness applies, the government bears the burden of persuading us there is no reasonable possibility that the instructional error affected the jury's finding of all the elements of the lesser-included offenses, and that appellant would not be unfairly prejudiced by entry of judgment thereon.

That is the conclusion we readily reach in considering Shanika's convictions for armed robbery and second-degree burglary while armed. In finding Shanika guilty of those greater offenses, there is no question the jury necessarily and actually found, and could find, all the elements of the lesser crimes of (unarmed)

robbery and second-degree burglary beyond a reasonable doubt.[44] We do not see how the instructional error possibly could have influenced the jury's determination of those elements. Shanika Robinson does not claim it did. And there is no unfairness that we can discern in reducing Shanika's convictions to those lesser-included offenses. Shanika unquestionably "had full notice of [her] potential liability for the lesser crime[s]" and "[t]here is no indication that defense presentation would have been altered" if the armed charges had been dismissed at the end of the government's case or if the trial court had instructed the jury on the lesser-included offenses.[45]

We are unable to say the same about the two murder counts on which Shanika was convicted. Indeed, Shanika cogently argues that there is a reasonable possibility she would have been acquitted altogether of the homicide charges had

---

[44] There is no dispute that unarmed robbery is a lesser-included offense of armed robbery and that unarmed burglary in the second degree is a lesser-included offense of armed burglary in the second degree. *See Fortune v. United States*, 59 A.3d 949, 958 (D.C. 2013) (noting that first-degree burglary is lesser-included offense of first-degree burglary while armed); *Foreman v. United States*, 988 A.2d 505, 506 (D.C. 2010) (noting that jury was instructed on unarmed robbery as a lesser-included offense of armed robbery).

[45] *Allison*, 409 F.2d at 451.

the court properly instructed the jury on the *mens rea* for aiding and abetting a "while armed" offense. The government's arguments to the contrary—which rest primarily on its contention that no rational jury could have failed to find Shanika knew Leon and Genus were armed—are not responsive to the evidence adduced at trial or to the jury's questions during deliberations, and are therefore not sufficient to meet the government's "high burden" of demonstrating harmlessness.[46]

Let us begin by addressing Shanika's conviction for felony murder with the predicate of armed robbery. Regarding this charge, the court instructed the jury that an aider and abettor is guilty of felony murder "for a killing that was committed in furtherance of a common purpose to commit the felony *or* a killing that was in the ordinary course of things a natural and probable consequence of the acts done in committing that felony." (Emphasis added.) Consistent with that instruction, Shanika argues, the jury might have found her guilty of felony murder as an aider and abettor based on its determination that the killing of Shahabuddin was "in the ordinary course of things a natural and probable consequence" of an armed robbery. "A 'natural and probable' consequence in the 'ordinary course of

---

[46] *Longus v. United States*, 52 A.3d 836, 854 (D.C. 2012).

things' presupposes an outcome within a reasonably predictable range."[47] Shanika argues, and we must agree, that a homicide is a significantly more predictable outcome of an armed robbery than of an unarmed robbery.[48] It therefore seems reasonably possible that a properly instructed jury would not have found the killing to be the reasonably predictable outcome of the offense, unarmed robbery, that Shanika intended to facilitate, and hence would have acquitted her of felony murder. This means that an implied conviction for unarmed felony murder cannot be divorced from the instructional error. Moreover, the corollary fact that we cannot say the jury in this case necessarily and actually found the killing to be the natural and probable consequence of an unarmed robbery would seem to suggest that aiding and abetting felony murder with robbery as the underlying felony is not a true lesser-included offense of aiding and abetting felony murder with armed

---

[47] *Roy v. United States*, 652 A.2d 1098, 1105 (D.C. 1995).

[48] *United States v. Jones*, 517 F.2d 176, 181 (D.C. Cir. 1975) ("If there is a more natural and probable consequence of armed robbery than that the arms will be used and someone injured, we do not know what it is.") (cited with approval by *Allen v. United States,* 383 A.2d 363, 368 (D.C. 1978)).

robbery as the underlying felony. Each of these reasons precludes the option of modifying the judgment by reducing Shanika's felony murder conviction.[49]

Shanika's conviction for second-degree murder likewise could have been affected by the erroneous instruction that a defendant is liable for her accomplices' use of a weapon if she merely had reason to know they were armed. For as she points out, the jury was permitted to infer from the use of a weapon that a defendant had the heightened *mens rea* required for second-degree murder.[50] Conceivably, therefore, the erroneous instruction could have led the jury to find

---

[49] While the instruction allowed the jury to convict Shanika of felony murder if it found the killing to have been committed "in furtherance of a common purpose to commit the felony," rather than as a natural and probable consequence of the robbery, we cannot assume that the jury necessarily made such an "in furtherance" finding. As Shanika argues, the jury could have concluded from the testimony that Leon perpetrated the murder not in furtherance of the robbery but rather, to quote the prosecutor's summation, "[s]o he could exact revenge for disrespect to his sister."

[50] "Second-degree murder is a killing done with either specific intent to kill or inflict serious bodily harm, or a conscious disregard of the risk of death or serious bodily injury." *Coleman v. United States*, 948 A.2d 534, 550 (D.C. 2008) (citing *Comber v. United States*, 584 A.2d 26, 38-39 (D.C. 1990)). The trial court instructed the jury that it could infer the existence of such a *mens rea* if "the use of a weapon under all the circumstances would naturally and probably have resulted in death."

that Shanika satisfied the heightened *mens rea* requirement of second-degree murder based on proof that she had a less culpable mental state—not actual knowledge of her accomplices' possession of a weapon, but only reason to know they were armed (a mental state akin to negligence[51]). If that is what occurred, the erroneous instruction impermissibly lowered the government's burden of proving an essential element (the *mens rea*) of unarmed second-degree murder.[52] That possibility renders it inappropriate to enter judgment against Shanika on that lesser-included offense.

Accordingly, we reverse Shanika Robinson's convictions for each of the four "while armed" offenses and remand for a new trial on those counts of the indictment. However, in lieu of retrial on the armed robbery and armed second-degree burglary counts, the trial court may, with the consent of the government,

---

[51] *See* note 21, *supra*.

[52] *See Coleman*, 948 A.2d at 553 ("Although conviction for second-degree murder does not necessarily require proof of an 'intent to kill,' and may be based on proof of a 'conscious disregard of an extreme risk of death or serious bodily injury,' a conviction for second-degree murder cannot stand on the basis that the defendant was merely negligent.") (internal citation omitted).

enter judgments of conviction against Shanika on the lesser-included offenses of unarmed robbery and unarmed second-degree burglary.

## B. Leon Robinson's Claims

Leon Robinson's main claim on appeal is that the trial court abused its discretion in denying his mid-trial motion for severance because he and Shanika were presenting irreconcilable defenses. We have said that to demonstrate an abuse of discretion in such a denial of severance, an appellant "must show not simply prejudice, but that [he or she] suffered manifest prejudice from the joinder."[53] As a general matter, "'a trial court should grant a severance under [Criminal] Rule 14[54] only if there is a serious risk that a joint trial would

---

[53] *Coleman*, 948 A.2d at 544 (quoting *Hammond v. United States*, 880 A.2d 1066, 1089 (D.C. 2005)).

[54] Super. Ct. Crim. R. 14.

compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'"[55]

It is true that the defenses presented by Leon and Shanika were incompatible: Leon denied being present at the scene of the robbery and murder, while Shanika put him there and implicated him as one of the two assailants (though she did not actually testify that he committed the murder). However, "[i]t is well-settled that mutually antagonistic defenses are not prejudicial per se, and the mere fact that co-defendants' defenses are separate, distinct and antagonistic and that each may have a better chance at acquittal if tried separately is not sufficient for a grant of severance."[56] In numerous cases similar to this one, we accordingly have found no abuse of discretion in the denial of severance.[57]

---

[55] *Hargraves v. United States*, 62 A.3d 107, 115-16 (D.C. 2013) (alterations omitted) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

[56] *Id.* at 115 (internal quotation marks, ellipses, and footnotes omitted); *see also Ingram v. United States*, 592 A.2d 992, 996 (D.C. 1991) ("Unfair prejudice does not arise merely because defendants are mutually hostile and attempt to blame each other.").

[57] *See, e.g.*, *Taylor v. United States*, 601 A.2d 1060, 1063 (D.C. 1991) (holding that conflict between the defense asserted by defendant, that he was not

Leon has failed to make the strong showing of prejudice necessary to entitle him to a reversal of his convictions. He has neither indicated that a specific trial right was compromised nor adduced any reason to believe the jury was disabled from fairly adjudicating his guilt. The admission of Shanika's damaging testimony was not *unfairly* prejudicial, for she "testified under oath and was subject to cross-examination like every other witness."[58] And even apart from that testimony, the

---

present at scene of robbery, and defense asserted by codefendant, that he was at scene innocently while defendant robbed victim, did not require severance); *Lemon v. United States*, 564 A.2d 1368, 1371 (D.C. 1989) (trial court did not abuse its discretion in denying severance when one defendant testified that she participated in robbery under duress and identified co-defendant as perpetrator and co-defendant testified that he was not on the scene, when co-defendant was able to impeach credibility of defendant on cross-examination); *Ready v. United States*, 445 A.2d 982, 987 (D.C. 1982) (no abuse of discretion in denying severance when one defendant indicated that he "would testify that he shot into the air while appellant shot the victim[, while] Appellant, in sharp contrast, would present evidence that he had not been at the scene of the crime."); *Sweet v. United States*, 438 A.2d 447, 450 (D.C. 1981) (trial court did not abuse its discretion in denying severance when defendant testified that he participated in criminal offenses due to coercion by co-defendant and co-defendant did not testify, though he presented alibi witnesses who testified that he was out of state at the time of the crime).

[58] *Hargraves*, 62 A.3d at 116. As the Supreme Court has explained,

> [A] fair trial does not include the right to exclude relevant and competent evidence. A defendant normally would not be entitled to exclude the testimony of a former codefendant if the [trial] court did sever their

evidence of Leon's guilt was quite strong and well "beyond that required for the government to survive a motion for judgment of acquittal."[59] Accordingly, we reject Leon's severance claim.[60]

---

   trials, and we see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant.

*Zafiro*, 506 U.S. at 540.

[59] *Hargraves*, 62 A.3d at 116 n.29 (quoting *Ingram*, 592 A.2d at 997).

[60] Leon presents two other claims on appeal that we may dispose of summarily. First, he asserts that the government violated his Sixth Amendment rights by conditioning its offer of a plea deal on its acceptance by both defendants. We have, of course, condoned the government's discretion to offer such "wired" pleas. *See e.g.*, *Benitez v. United States*, 60 A.3d 1230, 1237 (D.C. 2013). Moreover, in this case, Leon was not prejudiced by the wiring, because his co-defendant was willing to accept the plea offer; it was Leon himself who rejected it. Thus, he was not prevented from taking the deal by the condition that Shanika had to accept it too.

Second, Leon contends the jury's finding that the murder was especially heinous, atrocious, or cruel, must be vacated because the jury was not instructed that it had to find that statutory aggravating circumstance beyond a reasonable doubt. However, recognizing that error, the trial court did not rely on the finding to enhance Leon's punishment, but instead sentenced him on the first-degree murder count to a term of imprisonment of 45 years, which is below the statutory maximum for that offense without a finding of aggravating circumstances. *See* D.C. Code § § 22-2104; 24-403.01(b-2)(1)(B) (2012 Repl.) (authorizing maximum sentence of 60 years' incarceration for murder in the first degree absent a finding of aggravating circumstances). Thus, Leon was not prejudiced by the error. On

**III.**

For the foregoing reasons, we reverse Shanika Robinson's convictions on four counts of the indictment for armed robbery, armed second-degree burglary, felony murder while armed with the predicate felony of armed robbery, and second-degree murder while armed, and remand for further proceedings vis-à-vis

---

remand, the court should simply vacate the jury's aggravating circumstance finding so that it cannot have any adverse collateral consequences.

those counts in accordance with this opinion.  In all other respects, we affirm the

judgments on appeal.[61]

*So ordered.*

---

[61] Leon's first-degree premeditated murder and felony murder convictions merge, and while the two felony murder convictions likely will be vacated in favor of keeping the premeditated murder conviction, if a felony murder conviction survives, it merges with the underlying felony.  In addition, as stated in note 60, *supra*, the jury's finding of a statutory aggravating circumstance should be vacated. All this may be addressed on remand.