Terrence FOX, Maurice Smith, and Donnell N. Stewart, Appellants,

v.

UNITED STATES, Appellee.

Nos. 08–CF–1376, 08–CF–1377, 08–CF–1499.

District of Columbia Court of Appeals.

Argued Dec. 14, 2010.
Decided Jan. 27, 2011.

Christine A. Monta, Public Defender Service, with whom James Klein and Jaclyn S. Frankfurt, Public Defender Service, were on the brief, for appellant Terrence Fox.

Donald L. Dworsky, for appellant Maurice Smith.

Judith A. Lovelace, appointed by the court, for appellant Donnell N. Stewart.

Angela M. Miller, Special Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III and Mary B. McCord, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and BLACKBURNE–RIGSBY, Associate Judges, and SCHWELB, Senior Judge.

FISHER, Associate Judge:

A jury convicted appellants Terrence Fox, Maurice Smith, and Donnell Stewart

of multiple charges stemming from their armed robbery of a liquor store and the ensuing car chase.[1] On appeal, appellant Stewart asserts that the evidence was insufficient to support his convictions for unlawful possession of a firearm by a felon, for the "while armed" element of armed robbery, and for possession of a firearm during a crime of violence. In addition, he argues that the jury instruction on aiding and abetting liability was erroneous and that his convictions for reckless driving and fleeing from a law enforcement officer should merge.

Appellant Fox argues that the trial court committed reversible error when it failed to stop the prosecutor from discussing, during rebuttal argument, documents that were not in evidence. All three appellants challenge their convictions for carrying a pistol without a license, unlawful possession of a firearm, and unlawful possession of ammunition, arguing that the manner in which Certificates of No Record (CNRs) were admitted to prove these charges violated their Sixth Amendment rights. Building on this argument, appellant Smith asserts that the admission of these CNRs tainted all of his convictions.[2] Finally, all three appellants assert that their convictions for theft and receipt of stolen property should merge. For the following reasons, we accept a few of appellants' claims and reject the rest.

## I.  The Factual and Procedural Background

On December 20, 2007, Demetrius Washington, Terrence Fox, Maurice Smith, and Donnell Stewart "planned to go rob [a] liquor store" in northeast Washington, D.C. To execute their plan, Mr. Smith and Mr. Fox stole a minivan by "popping out" the ignition and using a screwdriver to start the vehicle. Mr. Fox provided four masks and four sets of gloves for the men to wear. The men also planned to use handguns during the robbery, and Mr. Washington, Mr. Fox, and Mr. Smith each brought his own firearm. Mr. Stewart did not have his own handgun and did not bring a weapon to the liquor store.

Mr. Stewart drove the group to the Ole Reliable Liquor Store on Rhode Island Avenue, N.E. Mr. Washington testified that on the way to the store, he "gave [his gun] to [Mr. Stewart] and, before we got to the liquor store, I took it back from him before we entered the liquor store."

1. Appellants were found guilty of conspiracy to commit armed robbery (D.C.Code § 22–1805(a)); armed robbery (D.C.Code §§ 22–2801, –4502); possession of a firearm during a crime of violence (PFCV) (D.C.Code § 22–4504(b)); theft (D.C.Code §§ 22–3211, –3212(a)); unauthorized use of a motor vehicle (UUV) (D.C.Code § 22–3215); receiving stolen property (D.C.Code §§ 22–3232(a), –3232(c)(1)); carrying a pistol without a license (CPWL) (D.C.Code § 22–4504(a)); possession of an unregistered firearm (UF) (D.C.Code § 7–2502.01); unlawful possession of ammunition (UA) (D.C.Code § 7–2506.01(3)); fleeing from a law enforcement officer (D.C.Code § 50–2201.05b(b)(2)); and destruction of property (D.C.Code § 22–303). Appellant Stewart was also convicted of reckless driving (D.C.Code § 50–2201.04) and unlawful possession of a firearm after having

been convicted of a felony (D.C.Code § 22–4503(a)(2)); appellant Fox was also convicted of committing an offense while on release (D.C.Code § 23–1328(a)(1)).

2. In light of *Tabaka v. District of Columbia*, 976 A.2d 173 (D.C.2009), the admission of these certificates was constitutional error, and the government concedes that the CPWL, UF, and UA counts must be vacated with respect to each appellant. *See id.* at 175 (holding that a CNR is "testimonial" within the meaning of the Confrontation Clause of the Sixth Amendment and cannot be admitted without live testimony from the official who performed the search). We reject Mr. Smith's argument that the error in admitting the CNRs requires reversal of his other convictions.

Employee Virna Ingram was working a lottery machine near the front of the liquor store when the four masked men, three holding guns, entered. Mr. Smith and Mr. Fox ran to the main part of the liquor store while Mr. Washington pointed his gun at Ms. Ingram and demanded and took money from her drawer. Mr. Washington was wearing a "navy blue or black hoodie." Mr. Stewart was standing near the store's front window, also wearing a mask and a hoodie but not holding a gun. He ordered some of the customers in the store to empty their pockets and get on the floor.

Mr. Fox and Mr. Smith went to the sales counter in the main part of the store, where Daniel Wright and Paul Toor were working. Mr. Wright testified that both men were wearing masks, and that one of them—who was wearing "regular street clothes"—pointed his gun at Mr. Wright and told him to open the cash register. The other man moved toward Mr. Toor, who ran into an office, locked the door, and pushed the security alarm to call the police. Because the register was turned off, it would not open, and Mr. Fox and Mr. Smith had to resort to taking money from a second lottery machine next to the cash register. Mr. Toor testified that the robbers took between $600 and $700.

Mr. Stewart alerted his accomplices that Toor had pressed the security button, and the robbers left the store. In the parking lot, they ran directly past Metropolitan Police Department Detective Jamell Stallings and her partner. Indeed, the robbers ran so closely to Detective Stallings that she had to move out of their way. Mr. Stewart resumed his position in the driver's seat of the minivan, and the other three sat in the back. Detective Stallings and her partner got into their unmarked cruiser and followed the minivan, which Stewart drove away from the store at a high rate of speed, weaving in and out of traffic.

Officer James Chatmon took over the pursuit in his marked police cruiser with lights and sirens activated as the minivan drove toward the LeDroit Park neighborhood. At one point, the minivan sideswiped another vehicle, "mangling the driver's side," before turning onto W Street, N.W. The van then proceeded through an alley and into a parking lot.

Officer Mickey Green, an officer with the District of Columbia Housing Authority Police Department, was in the parking lot as the minivan arrived. Officer Green testified that Mr. Stewart looked him "dead in [the] face" as Stewart drove by. The minivan crashed into a tow truck, damaging the van. Mr. Stewart got out of the driver's side door and ran towards 4th Street; he was eventually apprehended by an MPD officer on the nearby campus of Howard University.

Officer Green saw Mr. Fox exit the passenger side door, followed by Mr. Smith, and he saw Mr. Washington attempting to get out of the driver's side door before Officer Chatmon ordered him to the ground. Officer Green helped arrest Mr. Fox, and Mr. Smith was also taken into custody at the scene. Detective Stallings identified Mr. Washington, Mr. Fox, Mr. Smith, and Mr. Stewart as the four masked men who had run past her in the parking lot because they "had on the same clothing that [she] saw them in ... 15 minutes" earlier.

Officers recovered three loaded handguns from inside the minivan, and three masks, a pair of gloves, and a single glove from the ground near the minivan. At the police station, Officer Damon Lessey watched officers recover a pair of gloves from Mr. Stewart, and a mask, a pair of gloves, and a screwdriver from Mr. Fox.

In addition, officers recovered a total of $346 from the four men.

## II. Appellant Stewart's Sufficiency of the Evidence Claims

■ The testimony established that appellant Stewart did not carry a firearm during the robbery. Nevertheless, viewed in the light most favorable to the government,[3] the evidence supported the jury's finding that Mr. Stewart, a felon, unlawfully possessed a firearm in violation of D.C.Code § 22–4503(a)(2). Mr. Washington testified that during the ride to the liquor store he "gave [his gun] to [Mr. Stewart], and ... took it back from him before we entered the liquor store." This account established that, at least for a brief period, Mr. Stewart actually possessed a firearm, and his conviction for this offense stands.

■ Although Mr. Stewart did not have a weapon in the liquor store, the evidence was more than sufficient to show that he aided and abetted an armed robbery. Aiding and abetting is established when the evidence shows that a "crime was committed by someone and that the alleged aider and abettor assisted or participated in that crime with 'guilty knowledge.' " *Lewis v. United States,* 996 A.2d 824, 831 (D.C.2010) (quoting *Tyree v. United States,* 942 A.2d 629, 636 (D.C.2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 1612, 173 L.Ed.2d 1000 (2009)). The government's evidence amply demonstrated that Mr. Stewart "could [have] reasonably foresee[n] that the principal[s] [would be] armed" during the robbery. *Guishard v. United States,* 669 A.2d 1306, 1314 (D.C. 1995) (citations omitted). Indeed, he had actual knowledge that the "crime would be committed 'while armed.' " *Hordge v. United States,* 545 A.2d 1249, 1256 (D.C.1988) (citing *Clark v. United States,* 418 A.2d 1059, 1061 (D.C.1980)). Not only did Mr. Stewart meet with Mr. Washington, Mr. Fox, and Mr. Smith before the robbery and together "plan[ ] to go rob the liquor store" using firearms, but he actively participated in the robbery alongside his three visibly armed co-conspirators. From its very inception, the crime that Mr. Stewart aided and abetted was *armed* robbery, and his attempt to distance himself now from the "armed" element of that offense is unpersuasive.

■ On the other hand, the evidence did not establish that Mr. Stewart aided and abetted the possession of firearms during a crime of violence. When the government relies on an aiding and abetting theory to prove PFCV, it is not enough to show that the defendant participated "in the 'larger scheme' of the armed robbery...." *Lancaster v. United States,* 975 A.2d 168, 175 (D.C.2009); *cf. McCoy v. United States,* 760 A.2d 164, 186–87 (D.C. 2000) ("Under *Halicki* [*v. United States,* 614 A.2d 499 (D.C.1992) ], more is required than general participation in the criminal venture for conviction of aiding and abetting the carrying of a pistol without a license."). Rather, the government "must prove some act on [the defendant's] part that assisted the robbers in *their* possession of firearms during the armed robbery." *Lancaster,* 975 A.2d at 175 n. 5. In *Lancaster,* we held that the proof of aiding and abetting was insufficient when a defendant aided and abetted an armed robbery without doing "anything at all to aid in *the possession of a firearm* by any of

3. *See Cannon v. United States,* 838 A.2d 293, 296 (D.C.2003) (citations omitted) ("In considering a claim of evidentiary insufficiency, this court must view the evidence in the light most favorable to the government, keeping in mind the right of the trier of fact to assess credibility and to draw reasonable inferences from the evidence.").

the robbers." *Id.* at 174–75 (emphasis in original).

The government understandably relies on *Dang v. United States*, 741 A.2d 1039 (D.C.1999), where we found sufficient proof that a defendant aided and abetted PFCV during an armed robbery. We were persuaded there by the government's argument that "Dang's concrete actions of blocking the door, guarding a victim, and pointing a knife at another victim 'assisted the principals in *maintaining possession* of the guns' by 'preventing the victims from grabbing the gun[s] or from obtaining outside help.'" *Lancaster*, 975 A.2d at 174 (quoting from the government's brief in *Dang* (emphasis in *Lancaster*)). In *Dang*, however, some of the victims moved to assist each other and had to be subdued by threats or by physical force. 741 A.2d at 1042.

We agree with Mr. Stewart that *Lancaster*, not *Dang*, controls here. Like the defendant in *Lancaster*, Mr. Stewart did not take any affirmative steps to aid his co-defendants in *their possession* of firearms: he did not provide the weapons, prevent the victims from seizing the handguns from his co-conspirators, or do anything to assist in their use. *Cf. Halicki*, 614 A.2d at 503 (aiding and abetting CPWL; there was no evidence that Halicki "in any way facilitated the initial acquisition of the weapons ... or that she played any role in the continued dominion and control over them by [her co-defendants]."). Rather than implicating Mr. Stewart in PFCV, the behavior that the government points to—standing in the front of the store, ordering customers to the floor, and warning his accomplices that

the alarm had been triggered—speaks only to his active involvement in the robbery itself. We are not willing to hold that acting as a lookout in an armed robbery is sufficient by itself to aid and abet the commission of PFCV by one's armed accomplices.[4]

### III. Appellant Stewart's Instructional Challenge

■ Mr. Stewart next argues that, because the trial court failed to expressly inform the jury that an aider and abetter must possess the same *mens rea* as the principal, the court's aiding and abetting instruction constituted reversible error under *Wilson–Bey v. United States*, 903 A.2d 818, 826, 836, 843 (D.C.2006) (en banc) (an instruction that told the jury that it need not find that the aider and abettor shared the principal's intent and permitted the jury to find aiding and abetting liability for any acts "that are the natural and probable consequences of the crime" was constitutional error). Because it was not raised below, we review this issue only for plain error. *Kidd v. United States*, 940 A.2d 118, 126 (D.C.2007). Mr. Stewart has not shouldered this heavy burden.

In this case the jury instruction did not contain the "natural and probable consequences" language disapproved of in *Wilson–Bey*. Moreover, the jury was told that, to convict Mr. Stewart, it had to find that he "knowingly" associated himself with the commission of a crime, participated in the crime as something that he "wished to bring about," and "intended by his actions to make it succeed." We examined virtually the same instruction in *Appleton v. United States*, 983 A.2d 970, 978 (D.C.2009), and—unpersuaded that such

---

4. As indicated above, Mr. Washington testified, "I gave [my gun] to [Mr. Stewart]" in the van, and "I took it back from him before we entered the liquor store." The government has not argued that Stewart's relinquishment of the firearm to Washington aided and abetted the possession of firearms during the robbery. Accordingly, we need not address whether such conduct would be sufficient to aid and abet PFCV.

language "raise[d] similar concerns to those stated in *Wilson–Bey*"—we held that the instruction was "not erroneous." Mr. Stewart's claim fails for the same reason. Indeed, it is hard to imagine how the aiding and abetting instruction could have confused the jury with respect to *mens rea*. The jury necessarily found that Mr. Stewart shared the intent of the other robbers when it found him guilty of conspiracy to commit armed robbery.

■■ Contrary to appellant Stewart's suggestion, *Wilson–Bey* did not overrule the principle, well-established in our case-law, that an individual is guilty of aiding and abetting an armed robbery if he aids and abets a robbery and he knows or has reason to know that the principal will be armed. *See, e.g., Guishard,* 669 A.2d at 1314 (aider and abettor must reasonably foresee that the principal will be armed); *Hordge,* 545 A.2d at 1256 ("[I]t is sufficient if there is evidence to support a reasonable inference that the accomplice was aware the crime would be committed 'while armed.'") (citations omitted). We find no error, and certainly no plain error, here.[5]

## IV. Mr. Stewart's Merger Claim

■■ Finally, Mr. Stewart argues that his convictions for reckless driving and fleeing from a law enforcement officer merge. We review this claim *de novo. Cullen v. United States,* 886 A.2d 870, 872 (D.C.2005). "[W]here the same act or transaction constitutes a violation of two different statutory provisions, the test to

be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Frye v. United States,* 926 A.2d 1085, 1098 (D.C.2005) (quoting *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)); *see also* D.C.Code § 23–112 (2001).

The offense of reckless driving is established by evidence that a defendant (1) operated a motor vehicle on a highway carelessly or heedlessly; and (2) did so in willful or wanton disregard of the rights or safety of others, or without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property. D.C.Code § 50–2201.04(b). The felony offense of fleeing from a law enforcement officer requires proof that a defendant (1) operated a motor vehicle; (2) knowingly failed or refused to immediately stop the vehicle or fled or attempted to elude a law enforcement officer, following a law enforcement officer's signal to bring the motor vehicle to a stop; and (3) drove the motor vehicle in a manner that (a) would constitute reckless driving, *or* (b) caused property damage, *or* (c) caused bodily injury. D.C.Code § 50–2201.05b(b)(1) and (2) (emphasis added).

Mr. Stewart's convictions for fleeing and for reckless driving do not merge because each offense required proof of a fact that the other did not. Obviously, the government need not prove flight from a law enforcement officer in order to prove reck-

---

5. There is no merit to Mr. Stewart's argument that the prosecutor's closing argument, in which he explained that the jury could find Mr. Stewart guilty of the substantive crimes charged as either a principal or an aider and abettor, "multiplied the prejudice done" by the trial court's aiding and abetting instruction. It is well settled that the government may proceed under both a principal and an aiding and abetting theory "so long as there is

evidence that the defendant participated—in one capacity or the other—in the events that led to the commission of the crime," *Tyree v. United States,* 942 A.2d 629, 637 (D.C.2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 1612, 173 L.Ed.2d 1000 (2009), and there was ample evidence from which the jury could conclude that Mr. Stewart participated in the crimes charged here.

less driving. Even assuming that reckless driving and fleeing a law enforcement officer would merge (as greater and lesser-included offenses) if the *only* basis for the fleeing charge was reckless driving, in this case the government established and the jury specifically found that, in fleeing from the police, Mr. Stewart not only (1) engaged in reckless driving, but also (2) caused property damage to the minivan. Property damage is not an element of reckless driving, so, in proving the offense of fleeing, the government proved a fact not necessary to prove reckless driving. The offenses do not merge.

## V. Mr. Fox's Challenge to the Prosecutor's Statements in Rebuttal

■ Mr. Fox asserts that the trial court committed reversible error when it failed to stop and to cure the prosecutor's remarks about "other police paperwork" in his rebuttal argument. On cross-examination, Mr. Fox's attorney asked both Officer Green and Officer Chatmon why they had not included more specific details—such as the names and physical descriptions of Mr. Fox and the other suspects taken into custody—on police paperwork they had filled out on the day of the robbery. Each officer responded that he had filled out the paperwork for a limited purpose.[6] Officer Chatmon further testified that more descriptive details are "usually" included in paperwork generated by detectives, and that it was not his responsibility to fill out that sort of paperwork in this case.

Referring to this line of questioning, defense counsel for Mr. Fox argued that the jury "cannot trust and believe the testimony of Officer Green," and asserted that the

government's case "boils down to . . . Demetrius Washington." In his rebuttal argument, the prosecutor responded to these statements, saying: "Ladies and gentlemen, you have heard testimony that there is other police paperwork that you have not seen that contains the material details of what happened that is created by the detective." After the trial court overruled defense counsel's objection, the prosecutor continued, "[I]s that really a reason for a reasonable doubt in this case? When you have been shown that there is other paperwork where the details are properly put down? It is not a reasonable doubt."

■ In reviewing a challenge to a prosecutor's argument, we first examine whether the statements were improper and whether the judge erred in failing to sustain the defense objection. *Diaz v. United States*, 716 A.2d 173, 179 (D.C. 1998) (quoting *Coreas v. United States*, 565 A.2d 594, 600 (D.C.1989)); *Irick v. United States*, 565 A.2d 26, 33 (D.C.1989) ("[I]t is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel."). Even if we conclude that the statements were improper, we will affirm the conviction unless we find—looking at "the gravity of the misconduct, [its] direct relationship to the issue of guilt, the effect of specific corrective instructions by the trial court, and the strength of the government's case," *Perez v. United States*, 968 A.2d 39, 80 (D.C. 2009) (quoting *Diaz*, 716 A.2d at 181)—that the defendant suffered "substantial prejudice." *McGrier v. United States*, 597 A.2d 36, 41 (D.C.1991) (quoting *Williams v. United States*, 483 A.2d 292, 297 (D.C. 1984)). There is no substantial prejudice if

---

6. Officer Chatmon stated that he was not "instructed or required to write out every single detail of what happened" on the PD–119 because the purpose of filling out that form was "[j]ust to document what each officer did . . .

[w]ith respect to the vehicle pursuit." Similarly, Officer Green testified that the PD–119 form he filled out, "wasn't in regards to the whole incident" but was only "in regards to [the officers'] use of force" during the arrest.

"we can say, 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *McGrier*, 597 A.2d at 41 (quoting *Gaither v. United States*, 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969)).

■ "It is incumbent upon the prosecutor 'to take care *to ensure* that statements made in opening and closing arguments are supported by evidence introduced at trial.'" *Anthony v. United States*, 935 A.2d 275, 284 (D.C.2007) (quoting *United States v. Small*, 316 U.S.App.D.C. 15, 19, 74 F.3d 1276, 1280 (1996)) (emphasis added in *Anthony*). That degree of caution was not exercised in this case. At the very least, the prosecutor's statements were inaccurate characterizations of the testimony. At the worst, he made his case vulnerable to the claim that he was asserting personal knowledge of facts not in evidence. *Cf. Daye v. United States*, 733 A.2d 321, 328 n. 6 (D.C.1999) ("The prosecutor's comment was ... improper because the jury knew nothing about hypothetical evidence or *lack* of evidence in the government's file implicating [the defendant]; it was being asked to take the prosecutor's word for it.").

Officer Chatmon had testified that more descriptive paperwork "usually" is (or should be) filled out by the detectives assigned to the case. But the jury had not "heard testimony that there [was] other police paperwork ... that contain[ed] the material details of what happened...." Nor had it "been shown that there [was] other paperwork where the details are properly put down[.]"

■ Nevertheless, we are sensitive to the principle that

closing arguments of counsel[ ] are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

*Donnelly v. DeChristoforo*, 416 U.S. 637, 646–47, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The challenged remarks are not naturally understood as assertions of personal knowledge, and the jury was instructed that the "statements and the arguments [of counsel] are not evidence." Although inaccurate, the prosecutor's comments referred to the evidence: "you have heard testimony that ..."; "you have been shown that...." An attentive jury, applying its common sense and the trial court's instruction, would realize that it had heard something different.

When the record is considered as a whole, we are satisfied that Mr. Fox did not suffer substantial prejudice, and reversal is not warranted. *See McGrier*, 597 A.2d at 41; *see also Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Contrary to Mr. Fox's assertions, the government mounted an extremely strong case against him, and the outcome of the case did not turn on the credibility of Officer Green or Officer Chatmon alone. Instead, a number of other witnesses linked Mr. Fox to the robbery: Mr. Washington testified that Mr. Fox was an active participant in the scheme; Detective Stallings identified Mr. Fox (by his clothing) as one of the robbers she saw run past her in the liquor store parking lot; and Officer Lessey testified

that he watched as other officers recovered a mask, a pair of gloves, and a screwdriver from Mr. Fox at the police station. Given the strength of the government's case, we can say with fair assurance that the judgment was not substantially swayed by the error, and Mr. Fox's convictions must stand.

## VI. Conclusion

For the reasons explained, we reverse the convictions for CPWL, UF, and UA with respect to each appellant; reverse Mr. Stewart's conviction for PFCV; and remand for vacatur of appellants' RSP sentences.[7] All other judgments on appeal are hereby

*Affirmed.*

---

7. All three appellants were convicted of theft and receiving stolen property (RSP) in connection with the same property, the stolen minivan. Because an accused "cannot be convicted of both theft and receipt of stolen goods with respect to the same property,"

*Cannon v. United States,* 838 A.2d 293, 299 (D.C.2003) (quoting *Roberts v. United States,* 508 A.2d 110, 113 (D.C.1986)), we agree with the trial court that appellants' sentences for RSP "should be vacated as merged when all appeal rights are exhausted."