*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-1168

VICTOR PARKER, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2014-CF3-019121)

(Hon. Robert Okun, Trial Judge)

(Argued May 31, 2023                                    Decided August 3, 2023)

*Daniel J. Hay*, with whom *Jeffrey T. Green*, *Madeleine Joseph*, and *Christin M. Sullivan Miller* were on the brief, for appellant.

*Katherine M. Kelly*, Assistant United States Attorney, with whom *Matthew M. Graves,* United States Attorney, and *Chrisellen R. Kolb*, *Elizabeth H. Danello*, and *Chimnomnso N. Kalu*, Assistant United States Attorneys, were on the brief, for appellee.

Before DEAHL and SHANKER, *Associate Judges*, and FISHER, *Senior Judge*.

DEAHL, *Associate Judge*:  Victor Parker challenges his convictions for robbery while armed and possession of a firearm during a crime of violence (PFCV). Those convictions stem from an incident in which two individuals, one of whom was

armed, approached and robbed a pair of roommates at night. Police found Parker with proceeds from that robbery about half an hour later, after he and another person bailed out of a car after a police chase. On appeal, Parker challenges the sufficiency of the evidence to prove he participated in the robbery. Even if the evidence was sufficient to prove that, he further argues that the evidence was insufficient to show he was the gunman, or that he aided and abetted the gunman, so that his PFCV convictions and the "while armed" enhancements to his robbery convictions should be vacated.

We conclude there was sufficient evidence to prove that Parker participated in the robbery, but insufficient evidence to sustain his PFCV convictions and the "while armed" enhancements. We therefore reverse Parker's PFCV and robbery while armed convictions, and remand for the trial court to enter judgments of conviction on two counts of the lesser-included offense of robbery.

**I.**

Brandon Stepp and Stacey Kelly were walking home one night after "a couple of beers" that left Stepp a bit tipsy. According to Stepp's testimony—Kelly did not testify—the pair were on a dimly lit street at around 1:15 a.m. when two men approached them from behind. One of the men "bear-hugged" Kelly, while the other

ordered Stepp to "get on the ground." Stepp and Kelly were separated as each of the robbers focused on one of them. The robber who focused on Stepp told him to lie face down on the ground and lightly slapped him on the back of the head a few times to encourage him to do so. As he was being robbed, Stepp thought he saw the man who grabbed Kelly pointing a gun at her chest. The men took Kelly's iPhone and Stepp's phone and wallet, which contained a metro card, a credit card, and a debit card.

After the robbers fled, Stepp and Kelly walked for about five minutes to a nearby Giant Food, where they told an off-duty police officer that they had been robbed at gunpoint. There they described the assailants as "two black males" of average height and build, "with dark clothing wearing masks," one of whom wore a parka. The officer called for backup and, a short while later, two other officers arrived, including Sergeant Charles Patrick. One of the responding officers tracked Kelly's iPhone using the "Find My iPhone" app on the officer's phone.

Sergeant Patrick broadcast a lookout for the suspects over police radio at 1:39 a.m., relaying Stepp and Kelly's description of their assailants and the location data from Kelly's iPhone, placing it at 12th and U Streets NW. Sergeant Patrick updated the phone's location when it had moved a block or two north to 12th

between V and W Streets NW. He then broadcast that it was moving southbound at 11th and R Streets NW by 1:42 a.m., and based on the speed it was moving, he surmised the suspects "could be in [a] vehicle." Around the same time, an officer responded that he had just seen four men in a 7-Eleven at 12th and U Streets NW— the iPhone's first broadcast location—one of whom was wearing a parka.[1] About a minute later, another officer in a marked car noticed two individuals in an older model Honda at the intersection of 11th and Q Streets NW—a block south of the phone's most recently broadcast location—and when she approached the car it sped off. She gave chase in her vehicle, and the car eventually collided with some parked vehicles near 4th and N Streets NW, and its occupants bailed out. A man who lived on the block had heard the crash and told the officer that he had seen two men wearing dark hoodies and dark jeans exit the car and run in the direction of New Jersey Avenue.

Police tracked Kelly's iPhone to the rear alley of the 1400 block of New Jersey Avenue, one block north from where New Jersey Avenue intersects with N Street.

---

[1] Electronic sales data showed that Stepp's credit and debit cards were used at that 7-Eleven to purchase cigarettes and Gatorade at 1:35 and 1:36 a.m.—a few minutes before Sergeant Patrick broadcast his initial lookout and six to seven minutes before the report of four men in the 7-Eleven. Stepp's credit card had also been used ten minutes earlier at a gas station at 15th and U Street to purchase cigarettes.

A few minutes later, officers found Parker in a stairwell in that alley. Officers "pinged" Kelly's iPhone, and the corresponding sound came from under a parked vehicle in front of where the officers found Parker. The iPhone was found in the pocket of a black Nike track jacket under the vehicle. Parker was arrested, and a subsequent DNA test found Parker's DNA on the black jacket. At the time of his arrest, Parker was wearing blue jeans and "bluish or purple" shoes. Officers found Stepp's metro card in Parker's pants pocket.

Officers searched the Honda, which had been stolen about a month prior. They found a BB gun and Stepp's credit card on the driver's side floorboard, and Stepp's debit card on the passenger's side floorboard. Various other items belonging to Stepp and Kelly were found throughout the front of the car. Parker's DNA was on the deployed front passenger-side airbag, his fingerprint was on a cellphone found in the front passenger-side door compartment, and his palm print was on the exterior of the front driver-side window. A black hat, found on the ground below the driver's side door, also contained Parker's DNA.

Parker was charged with two counts of robbery while armed, D.C. Code §§ 22-2801, -4502; two counts of PFCV, D.C. Code § 22-4504(b); three counts of receiving stolen property, D.C. Code § 22-3232(a), (c)(1)-(2); and two counts of

credit card fraud, D.C. Code § 22-3223(b)(1), (d)(2). A jury convicted Parker of both counts of robbery while armed and PFCV and two counts of receiving stolen property (relating to Kelly's and Stepp's property). The jury acquitted him of receiving the stolen Honda (the third count of receiving stolen property) and both counts of credit card fraud. Parker now appeals.

## II.

Parker makes two arguments. First, he challenges the sufficiency of the evidence supporting his convictions for robbery while armed and PFCV. Second, he argues that his grand jury rights were violated by the last-minute addition of an aiding-and-abetting instruction relating to the armed robbery and PFCV offenses. He does not challenge his convictions for receipt of stolen property. We address each argument in turn.

### A. Sufficiency of the Evidence Challenges

Parker raises three distinct sufficiency challenges. He challenges the sufficiency of the evidence supporting (1) his robbery convictions generally, and more narrowly, (2) his PFCV convictions and (3) the "while armed" enhancements to his robbery convictions. When reviewing the sufficiency of the evidence, we ask

whether the evidence "viewed in the light most favorable to the government" was "strong enough that a jury behaving rationally really could find it persuasive beyond a reasonable doubt." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (citation omitted). We give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (citation omitted).

## 1. Robbery

We first consider the evidence supporting Parker's robbery convictions. Parker argues that the government "offered no evidence that [he] came into possession of [stolen] items by being involved in the robbery as opposed to" merely receiving the stolen property from the robbers. He stresses that Stepp's description of the robbers was too skeletal to meaningfully connect Parker to the robbery. He further highlights the fact that police saw four men in the 7-Eleven at 12th and U Streets shortly before the car chase, and the fact that there were four sets of fingerprints in the car, as supporting his theory that he may have simply received the stolen property from the true robbers. In his view, it was thus pure speculation to conclude that he was one of the robbers as opposed to a mere recipient of the

robbery's proceeds.[2] We disagree and conclude a reasonable jury viewing the evidence in the light most favorable to the government could have concluded that Parker was one of the robbers.

"[T]he unexplained or unsatisfactorily explained possession of property recently stolen permits an inference that the possessor is the person who stole it." *Brown v. United States*, 146 A.3d 110, 113 (D.C. 2016) (quoting *White v. United States*, 300 A.2d 716, 718 (D.C. 1973)). Some of the robbery proceeds in this case were found in Parker's pocket (the Metro card); Kelly's iPhone was found in the jacket that had Parker's DNA on it and was recovered right next to where Parker was found; and Parker had just emerged from a vehicle that contained further proceeds. There was no real dispute that Parker was in the car and in possession of those proceeds of the robbery, and Parker never offered any explanation of how he came into possession of those items, permitting a reasonable inference that he was one of the robbers. Plus there was only about half an hour in the wee hours of the morning between the robbery and the beginning of the police chase. While that is

---

[2] Parker also points to his acquittal on the credit card fraud counts as evidence that the jury did not believe he was in control of the credit and debit cards the whole time. The more logical reconciliation of the jury's verdicts, however, is that while it believed beyond a reasonable doubt that Parker was one of the two robbers, it did not have proof beyond a reasonable doubt that Parker then used the credit cards; his lone accomplice might have done that on his own.

conceivably enough time to hand the proceeds off to a third-party, it is probably not enough time (or a conducive time of day) to arrange a third-party sale or to coordinate with a go-between, or fence, which are some of the more typical means of offloading stolen property.

We will nonetheless assume that Parker's mere possession of proceeds so close in time to the robbery would not alone constitute sufficient evidence to sustain his convictions, but even so assuming, there was still more evidence supporting these convictions. When police first saw Parker in the Honda, he was not by himself or with several other people, but instead he was one of just two men in the car. Two men, it so happens, had just robbed Stepp and Kelly a short time earlier. Additionally, Parker was in a car that fled police upon sight—and he then further bailed out of that car and hid from police—which was compelling consciousness of guilt evidence that a jury might think at odds with the mere receipt of stolen property. Not only is the receipt of stolen property a comparatively minor crime less likely to trigger somebody to lead police on a car chase, but a person who had merely received stolen property would have less reason to think that police could identify them; the victims might provide police with a description of their robbers, but not of any

downstream recipients of the proceeds.[3]   Finally, while we generally agree with Parker that Stepp's description of the robbers was too skeletal to meaningfully connect Parker to the robbery, the description was at least consistent with Parker's appearance, so it did not undercut the government's case.[4]

While it is certainly possible that the stolen items might have changed hands before police apprehended Parker, or that Parker just so happened to meet up with one of the robbers at some point and gotten in the car with him (with another robber exiting), it was not irrational for the jury to discount those slim possibilities.  There was no evidence to support them.  *Ochs v. District of Columbia*, 258 A.3d 169, 172 (D.C. 2021) (Sufficient "evidence need not compel a finding of guilt beyond a

---

[3] The recipient of a stolen iPhone might of course worry that it was being tracked, so we do not mean to overstate the point.

[4] Parker counters that (1) his jeans were blue rather than the "dark" clothing described, (2) he was wearing bluish or purple shoes, which neither Stepp nor Kelly mentioned, and (3) the jacket containing Kelly's iPhone that he was hiding near was a track jacket, not the winter coat or parka described.  To the extent these are inconsistencies at all, they are so minor that the jury could reasonably discount them, particularly when we draw all reasonable inferences in the government's favor, as we must on sufficiency review.  Some blue jeans are also fairly described as dark; recall that the witness who saw two people bail out of the Honda likewise described them as wearing dark jeans.  One might not notice the color of their robber's shoes, as Stepp gave no description of either robber's footwear.  Finally, only one of the robbers was described as wearing a parka, and Parker might simply have been the other robber whose outerwear was not described.

reasonable doubt, and it need not negate every possible inference of innocence." (quoting *Fitzgerald v. United States*, 228 A.3d 429, 437 (D.C. 2020)).

Parker counters with the radio broadcast at around 1:42 a.m. in which an officer relayed that he had seen four men, one of whom was wearing a parka, in the 7-Eleven at 12th and U Streets. The theory goes that if the two robbers were together with two other men shortly after the robbery that is some reason to think the proceeds were handed off between them. Maybe, but the jury had strong reason to think those were just four different men entirely. First, as Parker himself stresses as part of his affirmative argument, the description of the robbers—relayed over police radio— was extraordinarily vague. It was for two black men in dark clothes, one of whom was wearing a parka, and one officer responded that he saw four men, one in a parka, walking into the 7-Eleven. Even assuming two of those men were black and in dark clothes—presumably the officer would not have responded otherwise—this was the pre-dawn hours in the final days of October, when it would not be surprising to see people in parkas.

Also, the timeline of events does not quite match up with Parker's theory: (1) Stepp's cards were used at that 7-Eleven six to seven minutes before the report of four men in the 7-Eleven (at 1:35 and 1:36 a.m.); (2) around the very same minute

as the report of those four men in the 7-Eleven, the iPhone was moving southbound from around 11th and T Streets to 11th and R Streets, fast enough for Sergeant Patrick to surmise that the suspects were in a vehicle; and (3) Parker was spotted in the Honda at 11th and Q Streets—four blocks away—just one minute after the report of four men in the 7-Eleven.  Viewing the evidence in the light most favorable to the government, we conclude that the jury had strong reason to think those four men were entirely unrelated to the robbery.

Parker persists that his theory is further supported by the fact that four sets of fingerprints were recovered from the Honda after the crash.  But one of those sets of fingerprints was from the car's owner, who had been dispossessed of the vehicle about a month prior, so the fingerprints do not support a theory that the four men in the 7-Eleven each occupied the car.  And just as the owner's fingerprints had apparently remained in the car in the month since they were last in it, that fourth fingerprint was no real indication that anybody but the two most recent occupants spotted in the car had been inside of it close in time to the robbery.

## 2.  PFCV

Because we conclude that the evidence was sufficient to sustain Parker's robbery convictions, we now consider his culpability for the use of a gun during the

robbery. The government concedes that the evidence was insufficient to show that Parker was the actual gunman, but it posits that the evidence was sufficient to convict Parker of both PFCV and the "while armed" enhancements under an aiding and abetting theory of liability. Those offenses raise slightly different questions in the sufficiency analysis, and so we consider them in turn, beginning with PFCV.

To convict somebody of PFCV under an aiding and abetting theory, the government must "prove some act on the defendant's part that assisted the principal[] in [his] possession of firearms," undertaken "with guilty knowledge." *Tann v. United States*, 127 A.3d 400, 431, 438-39 (D.C. 2015) (citation omitted). "For such criminal liability to attach, of course, the . . . aid must be deliberate, not accidental." *Walker v. United States*, 167 A.3d 1191, 1201-02 (D.C. 2017); *see also Rosemond v. United States*, 572 U.S. 65, 77 (2014) ("[F]or purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission."). Assuming Parker was the unarmed robber, the government argues that there was sufficient evidence to conclude that he nonetheless acted to aid the armed robber by "subduing Stepp and preventing him from coming to Kelly's aid or seeking outside help." We disagree.

This case is not meaningfully different from *Fox v. United States*, 11 A.3d 1282 (D.C. 2011). In that case, a group of "four masked men, three holding guns," held up a liquor store at gunpoint. *Id.* at 1286. The lone unarmed robber, who was aware his accomplices were armed, ordered several customers to the floor as his co-conspirators stole several hundred dollars. *Id.* We concluded this evidence was insufficient to prove that the unarmed robber aided and abetted PFCV because he "did not provide the weapons, prevent the victims from seizing the handguns from his co-conspirators, or do anything to assist in their use" and so took no "affirmative steps to aid his co-defendants in *their possession* of firearms." *Id.* at 1288. To be sure, the accomplice actively participated in the robbery itself, but this did not entail the aiding of his cohort's possession of weapons. *Id.*

Likewise, there is no evidence here that the unarmed robber—who, again, we will presume for argument's sake was Parker—helped the armed robber maintain possession of his weapon. Parker ordered Stepp to the ground, giving him a few light slaps on the back of the head to encourage him to comply, and then took some of his property from his pockets. As in *Fox*, this shows that Parker actively participated in the robbery, but the government did not demonstrate that these actions helped the armed robber maintain possession of his weapon in any way.

The two cases the government cites, in which we upheld PFCV convictions on an aiding and abetting theory, are not to the contrary. In *Dang v. United States*, the accomplice had "worked in concert with [the principals]" by, among other things, kicking the husband of a woman who was being held at gunpoint, after the husband moved to help her. 741 A.2d 1039, 1042-43 (D.C. 1999). As we explained in *Fox*, "[i]n *Dang*, [] some of the victims moved to assist each other and had to be subdued by threats or by physical force." 11 A.3d at 1288. The accomplice in *Dang* was therefore helping the other robbers maintain possession of their firearms by subduing a victim who looked like he was about to interfere with that possession. There was no similar evidence here that Stepp moved to aid Kelly but had to be physically subdued, and so *Dang* is inapposite.

Similarly, in *Tann v. United States*, we upheld a PFCV conviction where Tann complied with his co-conspirator Cooper's instruction to rob Queen, a member of an opposing crew, as Cooper held another member of Queen's crew at gunpoint. 127 A.3d at 431-32. We concluded that Tann "prevent[ed] Queen from coming to the aid of his friend"—which, we noted, Queen was otherwise "in a position" to do—thereby assisting Cooper in maintaining possession of his firearm. *Id.* Though we did not mention whether Queen had in fact attempted to help his friend, there was strong reason to think he would have done so had he not been subdued. Queen

and his friend were rival crew-members who had "affronted the territory of [appellants' crew] by confronting [appellants'] fellow [crew] member . . . on [their] turf" and who were believed to "ha[ve] territorial aspirations adverse to the interests of appellants and their . . . associates." *Id.* at 426. There was thus evidence that Queen was quite likely to come to his friend's aid had he not been subdued, supplying the necessary evidence to convict Tann of PFCV under an aiding and abetting theory. Such evidence is, again, missing here.

Unlike in *Dang* and *Tann*, there was no evidence that Stepp was likely to interfere with the armed robber's possession of his weapon had he not been subdued. Stepp did not need to be physically subdued, as was the case in *Dang*, 741 A.2d at 1042. And there was no particular reason to think that Parker's actions prevented Stepp from coming to his friend's assistance, as was the case in *Tann*, 127 A.3d at 429, 431-32. A jury cannot reasonably conclude that an unarmed assailant has taken "affirmative steps to aid his [accomplices] in *their possession* of firearms," *Fox*, 11 A.3d at 1288—even when they have physically subdued a person—absent some evidence that the person subdued posed a threat of otherwise disarming the gunman. That evidence was present in *Dang* and *Tann*, but as in *Fox*, it is absent here. Had Stepp otherwise been inclined to make a run at the armed assailant in an attempt to disarm him, it is hard to conceive how Parker's directive that he "get on the ground"

and a few light slaps on the back of the head would have dissuaded him any more than the gun itself. Parker had no reason to think Stepp would try to disarm his accomplice, nor did Stepp show any signs of doing so. There was therefore insufficient evidence to support Parker's PFCV convictions.

### 3. "While Armed" Enhancements

The more difficult question is whether there was sufficient evidence to sustain the "while armed" enhancement to Parker's robbery convictions. In order to convict Parker of those enhancements under an aiding and abetting theory, the government was required to prove that he "*knew in advance* that his associate was armed with a gun—enabling the defendant to 'make the relevant (and indeed, moral) choice' to aid and abet an armed offense." *Tann*, 127 A.3d at 434 (quoting *Rosemond*, 572 U.S. at 78). "[I]f a defendant continues to participate in a crime after a gun was displayed or used by a confederate, the jury can permissibly infer from his failure to object or withdraw that he had such knowledge," but only if he learned of the gun early enough to have a "realistic opportunity to quit the crime." *Rosemond*, 572 U.S. at 78 & n.9. Unlike with the PFCV convictions, there is no additional requirement that Parker have aided his accomplice's possession of the gun.

The principal evidence that a gun was used during the robbery came through Stepp's grand jury testimony—admitted as substantive evidence—that "at some point, just sort of through glances," he saw that "there was what looked to be a gun directly in [Kelly's] chest." Stepp had no independent recollection of a gun being used by the time of trial, and there was no further description of a gun being brandished or announced. The government nonetheless argues that his testimony "created a reasonable inference that," because Stepp could see Kelly's assailant with a gun, Stepp's assailant must have likewise seen the gun and "continued to rob Stepp after" seeing it. We disagree, for two primary reasons.

First, no reasonable juror could conclude beyond a reasonable doubt that, just because Stepp momentarily saw a gun "through glances," his assailant must have likewise seen one. Even Stepp equivocated that he saw only "what looked to be a gun," and there was no evidence showing where the unarmed robber was standing or looking at that point. For all the evidence reveals, the robber might have been facing Stepp, rather than his accomplice, or otherwise had no line of sight to his accomplice. Second, there was no evidence elucidating when Stepp saw the gun, so that even if his assailant had seen it there was no basis to conclude that he "continue[d] to participate in" the robbery after a "realistic opportunity to quit the crime," as the government needed to prove. *Rosemond*, 572 U.S. at 78 & n.9.

To be sure, one might at least tentatively infer that people who engage in violent crimes together will generally know whether their accomplices are armed. But that is certainly not invariably true, and that inference alone is not proof beyond a reasonable doubt. That is particularly true here, where the government never identified Parker's accomplice, so there was (1) no evidence about the relationship between the two of them, and (2) no evidence whether they conspired beforehand or instead merely seized upon an impulsive crime of opportunity.

We therefore vacate Parker's convictions for robbery while armed, and direct judgment on the lesser-included robbery offenses, D.C. Code § 22-2801. *See Washington v. United States*, 965 A.2d 35, 42 n.21 (D.C. 2009) ("We may direct entry of judgment on a lesser-included offense when a conviction on the greater offense is reversed on grounds that affect only the greater offense, i.e., where the lesser offense was not affected by the error.").

## B. Prejudicial Variance

Parker finally argues the last-minute addition of an aiding-and-abetting instruction amounted to a prejudicial variance from the indictment's armed robbery charges. We disagree.

The Grand Jury Clause of the Fifth Amendment requires that a conviction be "based on an offense proved at trial and fully alleged in the indictment." *Scutchings v. United States*, 509 A.2d 634, 637 (D.C. 1986). A variance from the indictment occurs when "evidence at trial proves facts materially different from those alleged in the indictment." *Id.* at 636 (quoting *Gaither v. United States*, 413 F.2d 1061, 1071 (D.C. Cir. 1969)). A variance will be deemed prejudicial if it "deprives the defendant of an adequate opportunity to prepare a defense—i.e., [the indictment] fails to give him proper notice of the crime with which he is charged." *Zacarias v. United States,* 884 A.2d 83, 87 (D.C. 2005).

"It is well settled that if an indictment charges an individual as a principal, but the accused is convicted as an aider and abettor, there is not a . . . variance of the indictment." *Ingram v. United States*, 592 A.2d 992, 1006 (D.C. 1991). D.C. Code § 22-1805, which covers aiding and abetting, "makes no distinction between one who acts as a principal and one who merely assists the commission of a crime as an aider and abettor." *Id.* (quoting *Barker v. United States*, 373 A.2d 1215, 1219 (D.C. 1977)). And "[a]n aider and abettor may be indicted directly with the commission of the substantive crime and the charge may be supported by proof that he *only* aided and abetted in its commission." *Id.* (quoting *Barker*, 373 A.2d at 1219). Thus,

someone charged as a principal may be convicted only of aiding and abetting with no variance from the indictment. *See id.*

Parker persists that the aiding and abetting instruction effected a variance because it allowed the jury to find him guilty under a theory that he aided and abetted the robbery merely by helping to carry away the stolen property, while the government's theory throughout trial was that he was one of the robbers, so he did not have a full opportunity to prepare a defense to rebut such a theory. But even if the jury instructions might conceivably have permitted a conviction under the theory that Parker now posits,[5] that could not amount to a prejudicial variance where the government never even advanced such a theory, nor is there any indication that the

---

[5] It is highly questionable whether the instructions in fact would have permitted jurors to convict Parker under an aiding and abetting theory if they believed, as Parker had posited, that he was merely a downstream recipient of the proceeds. The jury was instructed that an element of robbery was "carr[ying] the property away," and that the "least removal of the [proceeds] from its place can be enough to show carrying away." It was these instructions, plus the aiding and abetting instruction, that Parker posits would have permitted the jury to convict him as a downstream recipient of the proceeds who then spirited them away. We doubt the jury would have understood the instructions in that manner, where the more natural reading of them was that the relevant "carrying away" of the proceeds was from the scene of the robbery itself—only the two robbers did that—not from some subsequent pit stop. The jury did not ask for any clarification of the instructions or otherwise signal that it was considering a more expansive reading of them. In any event, where no argument or other instruction invited the jury to adopt the theory that Parker now posits, we discern no prejudicial variance.

jury considered it. *See Zacarias*, 884 A.2d at 86-87 (variance warrants reversal only upon showing of prejudice); *Burgess v. United States*, 681 A.2d 1090, 1097 n.8 (D.C. 1996) ("When asserting a variance, a defendant has the affirmative obligation to show prejudice to the defense.").

The government never advanced a theory that Parker's only role was to help carry away the stolen goods, nor was there any indication that the jury considered such a theory (which would be hard to reconcile with Parker's PFCV convictions). In both its opening statement and its closing arguments, the government consistently maintained that Parker was one of the two men who robbed Stepp and Kelly. For instance, in closing, it said: "Here is why aiding and abetting is important. Brandon [Stepp] was not able to tell you which robber was which," so "you might not know which one [Parker] was, but you know he was one of them." We thus cannot conclude that Parker was unfairly surprised by a new theory that the government never in fact advanced before the jury, and there is no indication that the jury independently considered. Moreover, Parker did not propose any kind of instruction that the jury could convict him only if it found that he was one of the two on-scene robbers—it seems reasonably likely that both the government and the trial court would have been amenable to such an instruction—no doubt because, like us, he

discerned no meaningful risk of the jury, as instructed, convicting him under the getaway driver theory that he now posits.

## III.

For the foregoing reasons, we reverse Parker's convictions for robbery while armed and PFCV, and remand for the trial court to enter a judgment of conviction on two counts of robbery.

*So ordered.*